# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

ATLAS DATA PRIVACY CORPORATION, *et al.*,

            *Plaintiffs,*

v.

ACCUZIP, INC., *et al.*,

            *Defendants.*

Case No.: 1:24-cv-04383-HB

Civil Action

---

# ACCUZIP, INC.'S OPPOSITION TO
# PLAINTIFFS' 12(b)(6) MOTION TO DISMISS COUNTERCLAIMS

---

**GREENSPOON MARDER LLP**
Kelly M. Purcaro, Esq.
Kory Ann Ferro, Esq.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Tel.: (732) 456-8734 or 8746
Kelly.Purcaro@gmlaw.com
KoryAnn.Ferro@gmlaw.com

*Attorneys for Defendant AccuZip, Inc.*

# **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ...................................................................1

II.   FACTUAL BACKGROUND....................................................................2

    A.   Atlas Engineered a Mass Spam Campaign to Generate Claims, Not Compliance..................................................................................2

    B.   AccuZIP Responded Promptly and in Good Faith.............................3

    C.   Atlas' Unreliable Portal and Data Caused Disruption and Harm .........6

    D.   Timing and Scale of Atlas' Conduct Show Intent to Harm .................6

    E.   System Impairment, Operational Disruption, Harm Atlas Caused.......7

III.  LEGAL STANDARD ...........................................................................8

IV.   LEGAL ARGUMENT..........................................................................9

    A.   AccuZIP Sufficiently Pled a Claim for Relief under CFAA ...............9

        1.   AccuZIP Pled that Atlas Caused Damage/Loss over $5,000 ...14

        2.   AccuZIP Pled Violations of Multiple CFAA Subsections .......15

        3.   Atlas Misreads the Law, Mischaracterizes AccuZIP's Allegations, and Invites Premature Fact-Finding ....................17

    B.   AccuZIP Sufficiently Pled a Claim for Relief under CROA ..............20

        1.   AccuZIP Adequately Alleges the First CROA Element..........21

        2.   AccuZIP Adequately Alleges the Second CROA Element ......23

        3.   Atlas is Wrong on the Law and the Facts for CROA ..............24

    C.   AccuZIP Sufficiently Pled a Claim for Tortious Interference ............25

        1.   Reasonable Expectation of Economic Benefit Plausibly Pled..................................................................................25

        2.   Malicious Interference by Atlas is Sufficiently Pled...............26

        3.   Resulting Losses is Plausibly Pled...........................................28

V.    CONCLUSION...................................................................................29

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

*Advanced Fluid Sys., Inc. v. Huber*,
  28 F. Supp. 3d 306 (M.D. Pa. 2014) ...............................................................9, 14

*Am. Online, Inc. v. Nat'l Health Care Disc., Inc.*,
  121 F. Supp. 2d 1255 (N.D. Iowa 2000) ......................................... 11, 14, 16, 18

*Andritz, Inc. v. S. Maint. Contractor, LLC*,
  No. 3:08-CV-44(CDL), 2009 WL 10674137 (M.D. Ga. Feb. 4, 2009)................9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................8, 19

*Austar Int'l Ltd. v. AustarPharma LLC*,
  425 F. Supp. 3d 336 (D.N.J. 2019)....................................................................27

*Auto. Res. Mgmt. LLC v. Favo*,
  No. CV 21-2630 (SRC), 2022 WL 1080991 (D.N.J. Apr. 11, 2022) .................20

*Avaya Inc., RP v. Telecom Labs, Inc.*,
  838 F.3d 354 (3d Cir. 2016) ................................................................. 25, 26, 28

*B & B Microscopes v. Armogida*,
  532 F. Supp. 2d 744 (W.D. Pa. 2007) .................................................. 10, 12, 15

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................8

*Brooks v. AM Resorts, LLC*,
  954 F. Supp. 2d 331 (E.D. Pa. 2013)........................................................... 11, 18

*Christie v. Nat'l Inst. for Newman Stud.*,
  No. CV 16-6572 (FLW), 2019 WL 1916204 (D.N.J. Apr. 30, 2019) .................9

*Cline v. Reetz-Laiolo*,
  329 F. Supp. 3d 1000 (N.D. Cal. 2018)......................................................... 12, 18

*Craftmatic Sec. Litig. v. Kraftsow*,
  890 F.2d 628 (3d Cir. 1989) ...............................................................................9

*Dello Russo v. Nagel*,
   358 N.J. Super. 254 (App. Div. 2003)...................................................................27

*Fairway Dodge, L.L.C. v. Decker Dodge, Inc.*,
   191 N.J. 460 (2007) .............................................................................................20

*Farmers Ins. Exch. v. Auto Club Grp.*,
   823 F. Supp. 2d 847 (N.D. Ill. 2011)................................................. 10, 11, 15, 18

*Ferring Pharms. Inc. v. Watson Pharms., Inc.*,
   No. 2:12-CV-05824 (WJM), 2014 WL 12634303 (D.N.J. Aug. 4, 2014)...........20

*Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*,
   810 F.3d 1075 (7th Cir. 2016) ....................................................................... 13, 16

*Fineman v. Armstrong World Indus.*,
   980 F.2d 171 (3d Cir. 1992) ........................................................................... 25, 26

*Gaetano v. Gilead Sciences, Inc.*,
   529 F. Supp. 3d 333 (D.N.J. 2021)................................................................. 17, 23

*Great Lakes Rubber Corp. v. Herbert Cooper Co.*,
   286 F.2d 631 (3d Cir. 1961) .................................................................................19

*Gross v. Coloplast Corp.*,
   434 F. Supp. 3d 245 (E.D. Pa. 2020).....................................................................9

*Hauptmann v. Wilentz*,
   570 F.Supp. 351 (D.N.J. 1983)..............................................................................17

*Heartland Payment Sys., LLC v. Carr*,
   No. 318CV09764BRMDEA, 2021 WL 302918 (D.N.J. Jan. 29, 2021)..............25

*In re Adams Golf, Inc. Securities Litigation*,
   381 F.3d 267 (3d Cir. 2004) .......................................................................... 17, 23

*Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*,
   679 F. Supp. 3d 53 (D.N.J. 2023).........................................................................27

*Lamorte Burns & Co. v. Walters*,
   167 N.J. 285 (2001) .............................................................................. 25, 26, 27

*Modis, Inc. v. Bardelli*,
   531 F.Supp.2d 314 (D. Conn. 2008) ...................................................................10

*New Jersey Carpenters & the Trs. Thereof v. Tishman Const. Corp of New Jersey*,
   760 F.3d 297 (3d Cir. 2014) ...............................................................................8

*P.C. of Yonkers, Inc. v. Celebrations!*,
   No. 04-4554, 2007 WL 708978 (D.N.J. Mar. 5, 2007)......................................20

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore*,
   428 F.3d 504 (3d Cir. 2005) ...............................................................................9

*Phillips v. County of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ...............................................................................8

*Printing Mart-Morristown v. Sharp Electronics Corp.*,
   116 N.J. 739, 750–52 (1989) ................................................................ 25, 26, 28

*Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*,
   648 F.3d 295 (6th Cir. 2011) ......................................................... 11, 14, 16, 18

*ResMan, LLC v. Karya Prop. Mgmt., LLC*,
   No. 4:19-CV-00402, 2019 WL 4394564 (E.D. Tex. Sept. 13, 2019) ........... 13, 16

*Ryanair DAC v. Booking Holdings Inc.*,
   636 F. Supp. 3d 490 (D. Del. 2022) ................................................. 10, 14, 15-16

*Ryanair DAC v. Booking Holdings Inc.*,
   No. CV 20-1191-WCB, 2024 WL 3732498 (D. Del. June 17, 2024)........... 13, 16

*Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*,
   119 F. Supp. 2d 1121 (W.D. Wash. 2000) ...................................................... 13, 16

*SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.*,
   No. CV 20-2970, 2021 WL 1226411 (E.D. La. Apr. 1, 2021) ............................13

*St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*,
   347 F. Supp. 3d 1047 (M.D. Fla. 2018) ............................................... 12, 15, 18

*Teva Pharms. USA, Inc. v. Sandhu*,
   291 F. Supp. 3d 659 (E.D. Pa. 2018)..................................................... 10, 14, 16

*Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*,
  292 F.3d 384 (3d. Cir. 2002) ...................................................................................19

*United States v. Carlson*,
  209 F. App'x 181 (3d Cir. 2006) ...................................................... 11, 14, 16, 18

*United States v. Drew*,
  27 F. App'x 164 (4th Cir. 2001) ...................................................... 11, 14, 16, 18

*United States v. Lowson*,
  No. CRIM. 10-114 KSH, 2010 WL 9552416 (D.N.J. Oct. 12, 2010) .......... 13, 16

*Velop, Inc. v. Kaplan*,
  301 N.J. Super. 32 (App. Div. 1997) ...................................................................27

*Victaulic Co. v. Tieman*,
  499 F.3d 227 (3d Cir. 2007) ...................................................................... 17, 23

## <u>Statutes</u>

18 U.S.C. § 1030 ............................................................................................. *passim*

N.J.S.A.  2A:38A-1 ................................................................................................21

N.J.S.A. 2A:38A-2 .................................................................................................23

N.J.S.A. 2A:38A-3 ...................................................................................... 20, 22, 23

## <u>Rules</u>

Fed. R. Civ P. 9 .......................................................................................................8

Fed. R. Civ P. 12 ..................................................................................................8, 17

Fed. R. Civ P. 13 ....................................................................................................19

## I.  <u>PRELIMINARY STATEMENT</u>

Plaintiff AccuZIP, Inc.'s ("AccuZip") counterclaims arise from Atlas Data Privacy Corporation's ("Atlas") scheme to manufacture mass claims under Daniel's Law through a deliberate, high-volume email campaign that overwhelmed AccuZIP's computer systems, disrupted its business operations, and caused significant financial harm.

Atlas recruited nearly 20,000 purported covered persons, generated generic automated notices, and then intentionally bypassed AccuZIP's existing opt-out portal in favor of sending tens of thousands of invalid, non-standardized emails to a single support inbox. The flood of more than 48,000 emails – often duplicative and sent at a rate of approximately 7,000 per day – overwhelmed AccuZIP's systems, hindered access to legitimate customer communications, and risked server failure, forcing AccuZIP to undertake emergency engineering measures.

Despite these conditions, AccuZIP acted promptly and in good faith by contacting Atlas, proposing secure transfer methods, and developing automated suppression systems to ensure compliance. Yet, Atlas' portal and CSV outputs were unreliable, inconsistent, and "riddled with errors," compounding the disruption and requiring extensive manual reconciliation and technical work. As a result of Atlas' conduct, AccuZIP sustained damages exceeding $600,000.

Taken as true, these allegations more than plausibly support AccuZIP's counterclaims under the New Jersey Computer Related Offenses Act ("CROA"), the Computer Fraud and Abuse Act ("CFAA"), and for tortious interference. Atlas' motion must be denied.

## II.    FACTUAL BACKGROUND

### A.    Atlas Engineered a Mass Spam Campaign to Generate Claims, Not Compliance

Atlas leveraged Daniel's Law to create a "cottage industry" by recruiting purported covered persons, obtaining assignments of their rights, and targeting hundreds of businesses for mass claims. *See* CC[1] at ¶ 9. Atlas signed up thousands of alleged covered persons (the "Assignors"), provided a preset list of target companies, and generated "nondisclosure requests" on the Assignors' behalf. *Id.* at ¶ 10. Rather than individualized notices, Atlas generated "generic, autogenerated emails" that were devoid of key details needed to confirm that requests were *bona fide*, authorized, made by actual covered persons, or even tied to Protected Information as defined by the statute. *Id.* at ¶ 11. Atlas – not the Assignors – created and sent the requests. *Id.* at ¶12.

Atlas accumulated Assignors for roughly six months until it reached nearly 20,000, allegedly withholding opt-out activity until it reached "critical mass." *Id.* at

---

[1] "CC" refers to AccuZIP's Counterclaims set forth in its Answer, Affirmative Defenses, Counterclaims, and Demand for Jury Trial (Doc. No. 69).

¶ 13. If Atlas' priority were immediate safety, it would have sent opt-out requests promptly when Assignors signed up, not months later. *Id.* at ¶14. Atlas also failed to verify that Assignors qualified as covered persons, failed to verify that AccuZIP possessed or disclosed Protected Information, and failed to advise Assignors of AccuZIP's business and relevant practices. *Id.* at ¶¶ 15-17.

Once Atlas reached its desired scale, it sent "tens of thousands of emails nearly simultaneously," all from "@atlasmail.com," to "support@AccuZIP.com," rather than use AccuZIP's existing opt-out platform. *Id.* at ¶ 19. AccuZIP had (and has) a preexisting online opt-out process that could have been used to remove information regardless of covered-person status. *Id.* at ¶ 20. Atlas ignored that user-friendly option and instead executed a high-volume spam campaign. *Id.* at ¶¶ 19-20.

Atlas' notices were transmitted with invalid, non-standardized, and non-normalized data that rendered the information unusable and unable to match against AccuZIP's normalized datasets. *Id.* at ¶¶ 24, 28. Within days, tens of thousands of messages overwhelmed AccuZIP's systems and frustrated processing. *Id.* at ¶ 28.

## B.    AccuZIP Responded Promptly and in Good Faith

AccuZIP is a Texas company that provides postal presorting and mail tracking for business customers. *Id.* at ¶ 1. It enables businesses to validate addresses against the official USPS database, correct errors, and standardize mailing in compliance with USPS requirements, as well as mail tracking services. *Id.*

3

When AccuZIP unexpectedly was ambushed in early January 2024 with the first wave of spam emails flooding its inbox, AccuZIP immediately contacted Atlas to request clarification and assistance. *Id.* at ¶¶ 21, 25. AccuZIP's CEO and President directed the support team to follow up until resolution was reached and Atlas' representative "Matt" responded. *Id.* at ¶ 25. The next day, AccuZIP's CEO contacted Matt by email and phone, proposed a secure data-transfer process so protected information could be ingested and suppressed efficiently, and scheduled further discussions. *Id.* at ¶ 26. AccuZIP advised Atlas that the data required standardization and normalization to be processed. *Id.* at ¶¶ 27-28. AccuZIP preserved data by exporting emails into text format and requested a more workable secure delivery method, after which Atlas provided portal access for batch downloads. *Id.* at ¶ 29.

AccuZIP began developing automated, secure suppression processes and ultimately implemented encryption, automated ingestion, and matching logic to suppress protected records permanently across its systems. *Id.* at ¶¶ 29-33. In doing so, AccuZIP was required not only to engineer secure workflows, but also to design and implement customized parsing and normalization logic capable of handling Atlas' non-standardized, non-normalized, and inconsistent data deliveries. AccuZIP further processed this data against known, certified data standardization and

4

verification methodologies to enable accurate and reliable matching within high-volume batch processing environments.

Atlas intentionally provided data in a non-standardized and non-normalized format in a manner designed to frustrate accurate matching within the short ten-day statutory timeframe required under Daniel's Law. Atlas knew, or should have known, that industry-standard technologies and services exist to standardize address and identity data prior to delivery, including well-established certification and normalization methodologies that have been in continuous use for more than five decades. Such standardization is ubiquitous across multiple industries and is routinely applied at the point of data entry – for example, in e-commerce transactions where shipping addresses are normalized automatically to industry standards to ensure accuracy and deliverability.

Despite the availability and widespread adoption of these standard practices, Atlas failed to perform even the most basic standardization or normalization steps before transmitting the data. As a result, AccuZIP was forced to undertake additional technical remediation efforts – beyond what would ordinarily be required – to transform, normalize, and validate the data so that protected records could be identified and suppressed accurately. AccuZIP acted promptly, in good faith, and with technical diligence to ensure compliance notwithstanding Atlas' disruptive

delivery practices. *Id.* at ¶¶ 31-32. This materially increased the complexity and operational burden of achieving lawful suppression within the mandated timeframe.

### C.    Atlas' Unreliable Portal and Data Caused Disruption and Harm

Atlas' portal was unreliable from the outset, with repeated download errors, missing passwords, and ongoing discrepancies among the portal, exported CSV files, and Atlas email communications. *Id.* at ¶ 29, n.2. Atlas' platform produced conflicting information that undermined its reliability and AccuZIP was forced to build stable, automated suppression processes to ensure compliance. *Id.*

Atlas continued to bombard AccuZIP with invalid, non-normalized, non-standardized data, and CSV exports that were "riddled with errors and omissions," including misleading or backdated submissions, improperly formatted data, mismatches between the UI and CSVs, fabricated and phantom records, concatenated phone numbers, missing data, and missing delimiters. *Id.* at ¶¶ 37-39. These persistent defects made compliance extremely difficult and were designed to create further alleged "violations" rather than facilitate compliance. *Id.* at ¶ 39.

### D.    Timing and Scale of Atlas' Conduct Show Intent to Harm

Court-ordered productions reflect that Atlas claimed approximately 48,499–48,507 separate email requests sent on behalf of roughly 19,000 Assignors. *Id.* at ¶¶ 43-45. The lists indicate Atlas sent multiple separate emails for the same Assignor – including separate messages for address, phone number, alternate phone numbers

and alternate addresses, sometimes generating up to five emails for a single individual. *Id.* at ¶¶ 42, 45. Atlas sent these emails in a calculated and massive fashion immediately after the New Year holiday, at a pace of roughly 7,000 emails per day. *Id.* at ¶ 46. The timing and volume were chosen to frustrate the ten-day compliance period and make timely processing impossible. *Id.* at ¶¶ 36, 41, 46. Atlas made the court-ordered lists unmanageable – non-searchable, redundant, and difficult to import – further obstructing compliance. *Id.* at ¶ 48.

### E. System Impairment, Operational Disruption, Harm Atlas Caused

Atlas' campaign interfered with AccuZIP's systems and business, including business interruption, interruption of services, and diverted resources. *Id.* at ¶¶ 54-55. The email flood overwhelmed AccuZIP's support system, prevented timely access to legitimate customer inquiries, nearly crashed mail servers and exhausted storage capacity, and lost and/or delayed client communications. *Id.* at ¶ 60. AccuZIP was forced to implement emergency response measures and shoulder costs of remedial engineering and extensive manual reconciliation. *Id.* at ¶¶ 60-61.

The disruption was not merely technical; it affected AccuZIP's operations and customers. AccuZIP alleges it had to devote substantial time and limited resources to processing Atlas' deficient submissions, building a system to process requests, and performing manual reconciliation across emails, portal records, and exported files thereby diverting employees so they could not service legitimate clients and

7

business inquiries. *Id.* at ¶¶ 49, 55-56. AccuZIP estimates its resulting operational and financial damages exceed $600,000. *Id.* at ¶ 56.

Perhaps most egregiously, despite ongoing communications and AccuZIP's good-faith efforts to establish workable processes and finalize suppression measures, Atlas filed suit against AccuZIP on February 9, 2024, without prior notice while it knew AccuZIP's compliance measures were underway. *Id.* at ¶ 34. AccuZIP complied as soon as possible given Atlas' tactics, yet Atlas proceeded with litigation notwithstanding AccuZIP's ongoing compliance work. *Id.* at ¶ 35.

## III.   **LEGAL STANDARD**

On a Rule 12(b)(6) motion, the Court accepts well-pled facts as true and draws reasonable inferences in the non-movant's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *New Jersey Carpenters & the Trs. Thereof v. Tishman Const. Corp of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014). Pleadings survive if they state a claim that is plausible and contain facts to "suggest the required elements" or "raise a reasonable expectation that discovery will reveal evidence" supporting the elements. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 55 (2007); *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). Courts do not weigh evidence or demand proof at this stage. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

Fraud claims must satisfy *Fed. R. Civ. P.* 9(b) by pleading the who, what, when, where, and how, but courts apply the rule with practicality, permitting

allegations based on information uniquely in the other party's possession to be pled on belief. *Gross v. Coloplast Corp.*, 434 F. Supp. 3d 245, 249 (E.D. Pa. 2020); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989).

## IV.    **LEGAL ARGUMENT**

### A.    **AccuZIP Sufficiently Pled a Claim for Relief under CFAA**

A CFAA, 18 U.S.C.A. § 1030, claim requires "(1) damage or loss [] during any 1-year period . . . aggregating at least $5,000 in value; (2) caused by; (3) violation of one of the substantive provisions of §§ 1030(a) or (b)." *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 326 (M.D. Pa. 2014), *aff'd*, 958 F.3d 168 (3d Cir. 2020) (internal quotes/cites omitted) (alteration in original); *see* 18 U.S.C. § 1030(g); *Christie v. Nat'l Inst. for Newman Stud.*, No. CV 16-6572 (FLW), 2019 WL 1916204, at *4 (D.N.J. Apr. 30, 2019).  "The CFAA prohibits seven types of computer crimes involving unauthorized access to computers (or access in excess of authorization) which results in obtaining information from or damaging the computer." *Huber*, 28 F. Supp. 3d at 326.  Relevant here, the CFAA precludes:[2]

> (1)    Intentional access to a computer without authorization or exceeding authorized access,[3] and

---

[2] Civil actions under CFAA are not limited to violations of subsection (a)(5). *See P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore*, 428 F.3d 504, 511 (3d Cir. 2005); *Andritz, Inc. v. S. Maint. Contractor, LLC*, No. 3:08-CV-44(CDL), 2009 WL 10674137, at *4 (M.D. Ga. Feb. 4, 2009).

[3] "Exceeds authorized access" means authorized access used "to obtain or alter information in the computer [to which] the accesser is not entitled[.]" 18 U.S.C.§ 1030(e)(6). "[T]he statute imposes liability on one who acts beyond the scope of her

9

thereby obtains "information from a protected computer."[4] 18 U.S.C. § 1030(a)(2)(C).

(2)    Access to a protected computer or exceeding authorized access "knowingly and with intent to defraud," and "by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." *Id.* at (a)(4).

(3)    "[K]nowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer." *Id.* at (a)(5)(A).

"[A] plaintiff must show *either* damage or loss." *Farmers Ins. Exch. v. Auto Club Grp.*, 823 F. Supp. 2d 847, 852 (N.D. Ill. 2011) (internal quotes/cites omitted) (emphasis in original); *see also* 18 U.S.C. § 1030(g). "Damage" is "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). A "barrage of calls and e-mails," which "diminish[ a party's] ability to use its systems and data because they prevented [the party] from receiving

---

access authority." *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 668 (E.D. Pa. 2018). Where a username and password are required to access a website, access obtained in violation of the terms of service exceeds authorization. *Ryanair DAC v. Booking Holdings Inc.*, 636 F. Supp. 3d 490, 509 (D. Del. 2022).

[4] A "protected computer" is "used in or affect[s] interstate or foreign commerce or communication[.]" 18 U.S.C. § 1030(e)(2)(B). "A computer is 'protected' if it is connected to the Internet." *Teva Pharms.*, 291 F. Supp. 3d at 668; *see also B & B Microscopes v. Armogida*, 532 F. Supp. 2d 744, 757 (W.D. Pa. 2007); *Modis, Inc. v. Bardelli*, 531 F.Supp.2d 314 (D. Conn. 2008). AccuZIP's computers qualify.

at least some calls and accessing or sending at least some e-mails" constitutes damage under a transmission claim. *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 301 (6th Cir. 2011). Such "diminished-ability concept" has been endorsed by numerous courts. *See id.* at 302; *Am. Online, Inc. v. Nat'l Health Care Disc., Inc.,* 121 F. Supp. 2d 1255, 1274 (N.D. Iowa 2000) ("[W]hen a large volume of [unsolicited bulk e-mail] causes slowdowns or diminishes the capacity of [the party] to serve its customers, an 'impairment' has occurred to the 'availability' of [the party's] 'system.'"). Indeed, in *United States v. Carlson*, 209 F. App'x 181 (3d Cir. 2006), the defendant was convicted for "sending thousands of e-mails to one e-mail address, which would clog the address" and thereby caused damage. *See also United States v. Drew*, 27 F. App'x 164, 164 (4th Cir. 2001) (CFAA "clearly criminalizes [] bombarding [] with massive numbers of e-mail messages.").

"Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). A party "can satisfy the CFAA's definition of loss by alleging costs reasonably incurred in responding to an alleged CFAA offense, even if the alleged offense ultimately is found to have caused no damage as defined by the CFAA." *Farmers Ins.*, 823 F. Supp. 2d at 854; *see also Brooks v.*

*AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (Loss includes "the cost of remedial measures taken to investigate or repair the damage to the computer" or "lost revenue resulting from a plaintiff's inability to utilize the computer while it was inoperable because of a defendant's misfeasance."); *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1049 (N.D. Cal. 2018) ("The cost of investigating unauthorized access and securing a computer network constitutes a 'loss' under the statute."). Losses asserted by the claiming party need not be robust to survive dismissal. *See St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*, 347 F. Supp. 3d 1047, 1062 (M.D. Fla. 2018) (denying dismissal where plaintiff alleged "lost time and effort needed to take subsequent remedial measures" to prevent future breaches, "other expenses" responding to the unauthorized access and "assessing the scope of intrusion," disruption in the day-to-day operations, and devotion of "substantial resources to managing its" data). *St. Johns Vein Ctr.* string cites nine cases wherein allegations from identifying, investigating, or ascertaining the extent of unauthorized access, resecuring servers, or conducting damage assessments were all sufficient to withstand dismissal. *Id.*; *see also B & B Microscopes*, 532 F. Supp. 2d at 758 (damage assessment and lost revenue due to service interruption sufficient).

There are two main differences between 18 U.S.C. § 1030(a)(2) and (a)(4) – first, "subsection (a)(4), unlike (a)(2), requires that a person act with the '*specific intent to defraud*'" and second, "a person violates subsection (a)(2) by merely

obtaining '*information*,' while (a)(4) requires that the person obtain '*anything of value.*'" *SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.*, No. CV 20-2970, 2021 WL 1226411, at *4 (E.D. La. Apr. 1, 2021) (internal cites omitted) (emphasis in original). Fraud under CFAA means "'simply . . . wrongdoing' and does not require 'proof of the common law elements of fraud.'" *Id.* at *5 (quoting *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000)) (alteration in original). Defraud means "'wronging one in his property rights by dishonest methods or schemes.'" *Id.* (quoting *Shurgard Storage Centers*, 119 F. Supp. 2d at 1126); *see also Ryanair*, No. CV 20-1191-WCB, 2024 WL 3732498, at *21 (Courts look for "evidence of deceit."); *Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016) (defraud means intent to deceive or cheat). "[C]ourts have found that a plaintiff states a claim under § 1030(a)(4) when it alleges that the defendant participated in dishonest methods to obtain the plaintiff's secret information." *SMH Enters*, No. CV 20-2970, 2021 WL 1226411 at *6 (internal quotes omitted); *see also United States v. Lowson*, No. CRIM. 10-114 KSH, 2010 WL 9552416, at *7-8 (D.N.J. Oct. 12, 2010) (finding intent to defraud properly pled where defendant accessed site in contravention of terms of service); *ResMan, LLC v. Karya Prop. Mgmt., LLC*, No. 4:19-CV-00402, 2019 WL 4394564, at *3 (E.D. Tex. Sept. 13, 2019) (plaintiff sufficiently pled defendant provided database access to third party in violation of terms of service).

A "person who did not directly access the computer may still be liable under the CFAA if he 'directs, encourages, or induces' someone else to access a computer that he himself is unauthorized to access." *Teva Pharms.*, 291 F. Supp. 3d at 671 (cite omitted); *see also Huber*, 28 F. Supp. 3d at 328 (sufficient allegations of conspiracy to gain access); *Ryanair*, 636 F. Supp. 3d at 499.

### 1.    *AccuZIP Pled that Atlas Caused Damage/Loss over $5,000*

Damage under 18 U.S.C. § 1030(e)(8) includes any impairment to the availability of a system. Atlas' holiday-timed barrage of ~48,000 automated emails flooded a single AccuZIP inbox, degrading system availability, obstructing legitimate customer communications, and pushing AccuZIP's mail servers and storage capacity toward failure. AccuZIP was forced into emergency remediation – engineering fixes and manual reconciliation across emails, portal records, and flawed exports, which diverted staff from core operations and caused damages exceeding $600,000. *See Pulte Homes*, 648 F.3d at 301-02 (mass calls/emails diminished ability to use systems); *Am. Online*, 121 F. Supp. 2d at 1274 (bulk email causing slowdowns impairs "availability"); *Carlson*, 209 F. App'x 181 (thousands of emails clogging address constitutes damage); *Drew*, 27 F. App'x at 164 (bombardment with e-mail messages creates damage).

Loss includes reasonable costs to respond, investigate and restore systems, and consequential damages from service interruption. 18 U.S.C. § 1030(e)(11).

AccuZIP details the numerous ways in which Atlas' mass email flood and related ongoing obstructive behavior cost AccuZIP significant damages in incident response and investigation, including implementing emergency response measures and shouldering the costs of emergency engineering and extensive manual reconciliation – with aggregate losses well above $5,000. Courts hold that employee time, investigation, mitigation, and restoration costs suffice at the pleading stage. *See Farmers Ins.*, 823 F. Supp. at 852-54; *St. Johns Vein Ctr.*, 347 F. Supp. 3d at 1062; *B & B Microscopes*, 532 F. Supp. 2d at 758.

AccuZIP plausibly alleges "damage" (capacity impairment) and "loss" (response and restoration costs) far exceeding the $5,000 threshold in one year.

### 2. *AccuZIP Pled Violations of Multiple CFAA Subsections*

Only one violation is required to state a CFAA claim, yet AccuZIP pled multiple subsections violations and with the required plausibility. First, AccuZIP sufficiently pled violations of § 1030(a)(2)(C): Unauthorized Access to Obtain Information.  Atlas – rather than utilize designated opt-out processes – intentionally accessed AccuZIP's protected computers by funneling ~48,000 auto-generated emails into an internal business account and, through that access, obtained information (including system behavior, delivery telemetry, and leverage for manufactured claims). "[O]btaining information" is construed broadly. *See Ryanair,*

636 F. Supp. 3d at 509 (terms-of-use-violative access sufficient); *Teva Pharms.*, 291 F. Supp. 3d at 668 (exceeding access scope sufficient).

Next, AccuZIP pled a violation of § 1030(a)(4): Unauthorized Access with Intent to Defraud and Obtain Value. AccuZIP alleges a deceit-driven scheme through Atlas mislabeling AccuZIP as a "people search provider" when AccuZip provides postal services and mail tracking for companies, misrepresenting covered-person status and request validity, withholding requests to obstruct compliance, duplicating/inflating volume, and engineering a "critical mass" launched during holiday time to extract high statutory-damage value, feigning cooperation while providing further unreliable and massive amounts of data intended to stall while Atlas filed suit, thus defrauding. "Defraud" means dishonest methods/schemes and "value" is broadly interpreted. *See Shurgard*, 119 F. Supp. 2d at 1126; *Fidlar Techs.*, 810 F.3d at 1079; *Lawson*, 2010 WL 9552416, at *7-8; *ResMan*, 2019 WL 4394564, at *3; *Ryanair*, 2024 WL 3732498, at *21.

Further, AccuZIP pled facts for violations of § 1030(a)(5)(A): Knowing Transmission Causing Damage. Atlas knowingly transmitted ~48,000 emails during the holiday, intending to overwhelm AccuZIP's systems, which caused system impairment (blocked/disabled communications). Mass digital bombardment is actionable. *See Pulte Homes*, 648 F.3d at 301-02; *Am. Online*, 121 F. Supp. 2d at 1274; *Carlson*, 209 F. App'x 181; *Drew*, 27 F. App'x at 164.

16

### 3. *Atlas Misreads the Law, Mischaracterizes AccuZIP's Allegations, and Invites Premature Fact-Finding*

Atlas' offers defenses to AccuZIP's counterclaims, rather than a basis to dismiss same, e.g., that bulk Daniel's Law emails were "ordinary pre-litigation conduct," that AccuZIP's "damage" is conclusory, that costs are not cognizable "loss," and that alternative, benign explanations defeat plausibility. Each defense fails. The question at this stage is plausibility of pleadings, not possible defenses to same. Defenses cannot justify dismissal. The Third Circuit has clearly stated that "an affirmative defense may not be used to dismiss a [] complaint." *In re Adams Golf, Inc. Securities Litigation*, 381 F.3d 267, 277 (2004). This rule reflects the fundamental principle that courts "will not rely on an affirmative defense . . . to trigger dismissal of a complaint under Rule 12(b)(6)." *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (2007) (internal quotes/cites omitted) (alteration in original). The rationale is straightforward: on a motion to dismiss for failure to state a claim, "all the well-pleaded material factual allegations of the complaint are taken to be true, and the complaint is to be read in the light most favorable to plaintiff." *Hauptmann v. Wilentz*, 570 F.Supp. 351, 364 (1983). Because affirmative defenses "generally depend on extrinsic facts," courts must "tread warily, dismissing under Rule 12(b)(6) only when the plaintiff has effectively pled itself out of court." *Gaetano v. Gilead Sciences, Inc.*, 529 F. Supp. 3d 333, 348 (2021). Each of Atlas' defenses are inapplicable here.

17

*"Ordinary pre-litigation communications" Defense:* Atlas recasts a 48,000-email surge sent to the company inbox following New Year's with duplications, mismatched entries, and obstruction of validation as normal communications. Indeed, even following supposed provision of a platform for compliance purposes, Atlas continued to send false information both through the platform and via additional emails. AccuZIP alleges the timing, scale, duplication, and misdirection were engineered to impair AccuZIP's systems and manufacture claims – the very conduct courts have condemned as "email bombardment" under CFAA. *See Pulte Homes*, 648 F.3d at 301; *Am. Online,* 121 F. Supp. 2d 1274; *Carlson*, 209 F. App'x 181; *Drew*, 27 F. App'x at 164.

*"No 'damage'; no 'loss' ≥ $5,000" Defense*: Atlas argues AccuZIP's damage/loss are conclusory. Not so. AccuZIP pled concrete system-availability impairment (blocked/disabled sales inbox) and response costs (restoration/mitigation, business interruption, building out new technical response systems) which damages AccuZIP estimate to exceed $600,000 as a result. Such harm is the type that courts repeatedly recognize as "damage" and "loss" under § 1030(e)(8), (e)(11). *See id.; Farmers Ins.*, 823 F. Supp. 2d at 854; *Brooks v*, 954 F. Supp. 2d at 338; *Cline*, 329 F. Supp. 3d at 1049 *St. Johns*, 347 F. Supp. 3d at 1062. No forensic bill of particulars is required.

*"Alternative explanations defeat plausibility" Defense:* Atlas speculates there are benign explanations (e.g., volume reflected real senders; emails couldn't harm a sophisticated company; any access was permitted). *Iqbal/Twombly* do not require disproval of alternative hypothesis. AccuZIP need only plead a plausible one – here, a detailed narrative with dates, volumes, system impacts, and Atlas obstructive acts. Competing explanations are classic fact disputes, not dismissal grounds.

*"Assignee status" Defense:* Atlas disingenuously suggests its appearance "as assignee"[5] immunizes it from tort liability for its own conduct (recruitment, auto-generation, timing, duplication, inbox targeting, obstruction). Assignee status does not bar counterclaims for Atlas' independent torts and Atlas cites no authority to the contrary. Atlas' assignee argument deserves short shrift.

*CROA ≈ CFAA Defense*: Atlas argues the New Jersey CROA claims fail and, *ipso facto*, the federal CFAA claims fail. Not true and not here. The statutes are different. For example, unlike CROA, CFAA expressly defines "damage" and "loss" to include system-availability impairment and incident-response costs and provides a private civil remedy with a $5,000 loss threshold that AccuZIP has plausibly pled.

---

[5] Atlas filed suit and took actions giving rise to counterclaims. Rule 13 allows counterclaims. *See Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389 (3d. Cir. 2002) (counterclaims proper where there is "a logical relationship" to conduct; "logical relationship has been viewed liberally[]"); *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3d Cir. 1961).

AccuZIP pled facts which certainly meet the plausibility bar. Mass, intentional transmissions to inbox timed for holiday season; duplications; obstruction of validation; unauthorized access and knowing transmission causing damage evince liability under the CFAA. Impairment of the availability of core systems (blocked customer communications; disabled lead channel) created damage. Response, investigation, restoration, mitigation, and business interruption caused loss well over $5,000. Atlas engaged in a deception-based scheme to manufacture litigation value with the intent to defraud and obtain value. AccuZip pled detailed, non-conclusory facts that, taken as true, state claims under 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), (a)(5)(A), and (b).

**B.    AccuZIP Sufficiently Pled a Claim for Relief under CROA**

To state a claim under CROA, *N.J.S.A.* 2A:38A-3, a party must allege: (1) at least one of the statute's purposeful or knowing unauthorized acts, and (2) resulting damage to business or property. *Id.* at (a)-(e); *Fairway Dodge, L.L.C. v. Decker Dodge, Inc.*, 191 N.J. 460, 468 (2007); *P.C. of Yonkers, Inc. v. Celebrations!*, No. 04-4554, 2007 WL 708978, at *8 (D.N.J. Mar. 5, 2007). *N.J.S.A.* 2A:38A-3[6] states:

---

[6] Atlas narrowing CROA to "anti-hacking" is incorrect. CROA prohibits actions enumerated five subsections. *See Ferring Pharms. Inc. v. Watson Pharms., Inc.*, No. 2:12-CV-05824 (WJM), 2014 WL 12634303, at *6 (D.N.J. Aug. 4, 2014) (denying dismissal where defendant accessed a restricted webcast by evading password); *Auto. Res. Mgmt. LLC v. Favo*, No. CV 21-2630 (SRC), 2022 WL 1080991, at *3 (D.N.J. Apr. 11, 2022)(CROA prohibited accessing work email post-termination).

A person or enterprise damaged in business or property as a result of ***any of the following actions*** may sue . . . :

a. The purposeful or knowing, and unauthorized altering, damaging, taking ***or*** destruction of any data, database, computer program, computer software ***or*** computer equipment . . . ;

b. The purposeful or knowing, and unauthorized altering, damaging, taking ***or*** destroying of a computer, computer system or computer network;

c. The purposeful or knowing, and unauthorized ***accessing or attempt to access*** any computer, computer system or computer network;

d. The purposeful or knowing, and unauthorized altering, accessing, . . . a financial instrument; ***or***

e. The purposeful or knowing accessing and ***reckless*** altering, damaging, destroying ***or*** obtaining of any data, data base, computer, computer program, computer software, computer equipment, computer system or computer network.

[(emphasis added).]

### 1. *AccuZIP Adequately Alleges the First CROA Element*

Atlas acted "purposefully or knowingly" and without authorization and/or recklessly, violating CROA § (a)-(c) and (e). Under CROA, "access" includes "instruct[ing], ***communicat[ing] with***, stor[ing] data in, retriev[ing] data from, or otherwise us[ing] any resources of a computer, computer system, or computer network." *N.J.S.A.* 2A:38A-1(a) (emphasis added). Courts recognize "access"

21

includes *communication-based* intrusions. *Atlas Data Corp. v. REIPRO, LLC*, Dkt. No. MRS-L-231-24 (Feb. 21, 2025) (Purcaro Cert., **Exhibit A**).

Here, Atlas engaged in unauthorized communication with AccuZIP's systems by transmitting nearly 48,000 spam, auto-generated emails to the company inbox over a holiday period rather than utilizing the proper channels through AccuZip's preexisting out-out process which is clearly available on its public facing website. AccuZIP recognized this as a security threat and reacted, immediately contacting Atlas about same. Such massive spam attack is exactly the type of access intrusion CROA prohibits under §§ 2A:38A-3(a), (b), (c), and (e).

Atlas deliberately flooded AccuZIP's computers after spending months collecting ~20,000 Assignors and withholding their purported "requests" until Atlas aggregated a critical mass for its attack. Atlas transmitted ~48,000 auto-generated emails to AccuZIP during the 2024 New Year's holiday and continued to do so even after it provided an alternate platform to Atlas for submissions. Both on the "compliance platform" and the email onslaught, multiple requests were created per Assignor (and,, indeed sham requests were identified as well) with various combinations of addresses and numbers designed to artificially inflate email volume. Such facts support a plausible claim for "purposeful or knowing unauthorized"

and/or "reckless" accessing, taking, altering, or damaging. The attack was timed and designed to damage AccuZIP's systems.[7]

### 2.    *AccuZIP Adequately Alleges the Second CROA Element*

AccuZIP sufficiently pleads damage to its business and property. The CROA expressly recognizes that "property or services, including the use of computer time" are compensable and that value is measured by fair market value or the cost of generating, obtaining, or storing data. *N.J.S.A.* § 2A:38A-2.

Atlas' attack directly disrupted AccuZIP's business operations, overwhelmed AccuZIP's email and servers, exhausted storage capacity, caused lost and delayed communications, and caused "disruption of use" as a result. These allegations are sufficient to plead damages. AccuZIP was forced to address the cyberattack and divert resources to handle and respond to the deluge and take action to prevent further harm. Such allegations go beyond the minimal pleading threshold.

Nearly identical conduct by Atlas, i.e., allegations of a mass-email cyberattack, has been held sufficient to plead business damage. Indeed, it was foreseeable that sending tens of thousands of emails in a compressed timeframe could disable a system, impede operations, and disrupt a company's ability to serve customers – satisfying § 2A:38A-3(e). *See Atlas Data Corp. v. REIPRO, LLC*, Order

---

[7] Fact-intensive disputes cannot be resolved on a 12(b)(6) motion. *In re Adams Golf*, 381 F.3d at 277; *Victaulic Co.*, 499 F.3d at 234; *Gaetano*, 529 F. Supp. 3d at 348.

at 21. The same logic applies here. Atlas overwhelmed AccuZIP's servers, emails, and system, triggered emergent security response measures on a massive scale, and diverted resources – clear, cognizable CROA business damage.

### 3.     *Atlas is Wrong on the Law and the Facts for CROA*

Atlas ignores AccuZIP's detailed facts.  Instead, Atlas claims AccuZIP alleges only the "appearance" of a cyberattack and no concrete damage. Not so. AccuZIP pleads specific, non-conclusory facts showing intentional, unauthorized access and reckless access resulting in business harm estimated to exceed $600,000.

Atlas claims that no damage or taking is alleged, both misstating the requirements under CROA's five sections and ignoring that "access" is established through communications as pled. Atlas mistakenly imposes a damage-to-computer measure here, when same is not required under CROA and further ignores the business damage pled by AccuZIP, as detailed above.  Further, as described, Atlas' suggestion that the emails were "ordinary" is contradicted the facts pled. Atlas' claim that no facts show it knew harm was likely when the opposite is true.  Not only does common-sense reflect damage resulting from Atlas' barrage, but Atlas had direct knowledge given the multiple correspondence between Atlas and AccuZIP during January and February of 2024, during which feigned cooperation period Atlas was preparing its lawsuit against AccuZIP. Atlas simply ignores the deliberate scheme alleged in detail and obvious inferences required in AccuZIP's favor.

24

Atlas' motion to dismiss fails here because AccuZIP pleads particularized facts showing purposeful, unauthorized, reckless conduct under CROA's broad.

### C.    AccuZIP Sufficiently Pled a Claim for Tortious Interference

The elements for tortious interference are: (1) reasonable expectation of economic benefit or a contract; (2) lost due to malicious interference, and (3) damages as a result. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir. 2016); *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 750–52 (1989); *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 186 (3d Cir. 1992). AccuZIP sufficiently alleged facts in support of each element of this claim.

### 1.    *Reasonable Expectation of Economic Benefit Plausibly Pled*

"An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling, or occupation, free from undue influence or molestation. Not only does the law protect a party's interest in a contract already made, but it also protects a party's interest in reasonable expectations of economic advantage." *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 305 (2001) (internal cites/quotes omitted). A protectable right must be pled, but identification of specific customers lost is not required at the pleading stage. *Id.*; *see also Heartland Payment Sys., LLC v. Carr*, No. 318CV09764BRMDEA, 2021 WL 302918, at *7 (D.N.J. Jan. 29, 2021) ("[P]laintiff does not need to allege specific prospective customers or contracts to show a reasonable expectation of prospective

economic benefit.") (internal quotes omitted). A party need only allege enough facts to show a protective right (a prospective economic or contractual relationship) giving rise to some "reasonable expectation of economic advantage." *Printing Mart.*, 116. N.J. at 751. Prospective economic relationship is defined broadly, including "even the voluntary conferring of commercial benefits in recognition of a moral obligation" or "any other relations leading to potentially profitable contracts." *Fineman*, 980 F.2d at 195 (internal quotes/cites omitted); *see also Printing Mart*, 116 N.J. at 751-753 (reasonable expectation in ongoing/expected sales to the public).

AccuZIP is Texas company that provides postal presorting and mail tracking for business customers, enables validation of addresses against the official USPS database, correction of errors, and standardize mailing in compliance with USPS requirements, as well as mail tracking services. It had a reasonable expectation of continuing its relationships and business with current and perspective customers. AccuZIP sufficiently pled its "right to [its] business, calling, or occupation, free from undue influence or molestation" as required for this element. *Lamorte Burns*, 167 N.J. at 305*; Printing Mart*, 116. N.J. at 751.

### 2.    *Malicious Interference by Atlas is Sufficiently Pled*

"[M]alicious interference—requires only the intentional doing of a wrongful act without justification or excuse." *Avaya Inc.*, 838 F.3d at 383 (internal quotes/cites omitted). "Wrongful conduct [is] always viewed in the specific context . . . . It is

conduct that would not be sanctioned by the rules of the game." *Id.* (internal quotes/cites omitted). "Malice is determined on an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented." *Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*, 679 F. Supp. 3d 53, 111 (D.N.J. 2023) (internal quotes/cites omitted). Here, "malice is not used in the literal sense requiring ill will . . . . Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Dello Russo v. Nagel*, 358 N.J. Super. 254, 269 (App. Div. 2003) (internal quotes/cites omitted). The requisite intent may be "the taking of improper action with knowledge that interference will probably result." *Velop, Inc. v. Kaplan*, 301 N.J. Super. 32, 49 (App. Div. 1997). "The line clearly is drawn at conduct that is fraudulent, dishonest, or illegal and thereby interferes[.]" *Lamorte Burns*, 167 N.J. at 307. Allegations that Atlas "acted out of [its] own self-interest to enrich [itself] at the expense of [defendant] . . . are sufficient assertions of intent and malice." *Austar Int'l Ltd. v. AustarPharma LLC,* 425 F. Supp. 3d 336, 359 (D.N.J. 2019).

As detailed, Atlas purposefully engaged in a fraudulent scheme to self-profit off of Daniel's Law, and at the expense of Covered Persons and AccuZIP. Such self-interested conduct, i.e., holding back Assignors requests and launching its attack in a manner designed to frustrate compliance and interfere with AccuZIP's business and later feigning cooperation just to run the clock on statutory periods and

artificially manufacture claims - gives rise to an inference of malice. Similarly, Atlas' misrepresentations and deceptive practices, obstruction, sidestepping of dedicated opt-out processes, targeting email, an unreliable and unmanageable "platform," and inflating volume, support malice inferences.

### 3.    *Resulting Losses is Plausibly Pled*

For "loss and causation, there must be proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Avaya Inc.,* 838 F.3d at 383. "[I]t is sufficient that plaintiff prove facts which, in themselves or by the inferences . . . drawn therefrom, would support a finding that, except for the tortious interference by the defendant with the plaintiff's business . . . , plaintiff would have consummated the sale and made a profit." *Id.*; *see also Printing Mart*, 116. N.J. 739.

AccuZIP pled foreseeable losses caused by Atlas' interference. Atlas' coordinated attack and subsequent additional misrepresentations, inaccurate information, and duplication of processes through unreliable and fabricated platform data, impaired AccuZIP's operations, disabled use, overwhelmed systems, and blocked customer communications. AccuZIP's forced diversion of resources, disruption of business operations, impairment ability to serve customers, interruption of interstate commercial activity, and actions to prevent further harm

caused business and revenue losses, which would not have occurred but for Atlas'

malicious interference.

## V.    <u>CONCLUSION</u>

For the reasons set forth herein, AccuZIP respectfully requests Atlas' motion

to dismiss AccuZIP's counterclaims be denied in its entirety.

Dated February 3, 2026.                **GREENSPOON MARDER LLP**

<u>/s/Kelly Purcaro</u>
Kelly M. Purcaro, Esq.
Kory Ann Ferro, Esq.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Tel.: (732) 456-8734 or 8746
Kelly.Purcaro@gmlaw.com
KoryAnn.Ferro@gmlaw.com

*Attorneys for Defendant AccuZip, Inc.*